# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEXAS ENVIRONMENTAL JUSTICE ADVOCACY SERVICES<br>900 North Wayside Dr.<br>Houston, TX 77023,<br><br>CALIFORNIA COMMUNITIES AGAINST TOXICS<br>P.O. Box 845<br>Rosamond, CA 93560;<br><br>ENVIRONMENTAL INTEGRITY PROJECT<br>1000 Vermont Ave. NW, Suite 1100<br>Washington, D.C. 20005;<br><br>LOUISIANA ENVIRONMENTAL ACTION NETWORK<br>P.O. Box 66323<br>Baton Rouge, LA 70896;<br><br>OHIO VALLEY ENVIRONMENTAL COALITION<br>P.O. Box 6753<br>Huntington, WV 25773;<br><br>RISE ST. JAMES<br>8581 Hwy 18<br>St. James, LA 70086; *and*<br><br>SIERRA CLUB<br>2101 Webster St., Suite 1300<br>Oakland, CA 94612,<br><br>                    *Plaintiffs*,<br><br>        v.<br><br>ANDREW WHEELER, Administrator,<br>U.S. Environmental Protection Agency, in his official capacity,<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460,<br>                    *Defendant*. | Civil Action No. 1:20-cv-3733<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     This is a suit to compel the Administrator of the United States Environmental Protection Agency ("EPA") to take actions mandated by the Clean Air Act, 42 U.S.C. §§ 7401–7671q ("the Act"), to protect public health and the environment from industrial sources of air pollution.  For the chemical plants that are the subject of this complaint, EPA has failed to perform its non-discretionary duties to review air standards under §§ 7412 and 7411 and to either revise such standards or promulgate a determination that revision is not required, and is thus in ongoing violation of the Act.  This complaint seeks to compel these overdue EPA rulemakings for the Synthetic Organic Chemical Manufacturing Industry ("SOCMI") source categories regulated under what is known as the "Hazardous Organic" National Emission Standards for Hazardous Air Pollutants ("Hazardous Organic NESHAP" or "HON" rule"), 40 C.F.R. Pt. 63 Subpts. F, G, H, I, and the SOCMI New Source Performance Standards ("NSPS"), 40 C.F.R. Pt. 60 Subpts. III, NNN, RRR, VV-VVa.

2.     Petrochemical and other chemical plants in these source categories are major sources of pollution.  These sources emit highly hazardous air pollutants ("HAPs"), including carcinogens like ethylene oxide that contribute to cancer risk hotspots in Texas, Louisiana, West Virginia and other states. These sources also emit non-HAP volatile organic compounds.

3.     After EPA's National Air Toxics Assessment revealed extreme cancer risk hot spots in 2018, EPA committed to review the emission standards for synthetic organic chemical manufacturing plants to address this health threat, but it has failed to complete action fulfilling this promise. *See* EPA, Agency Actions on Ethylene Oxide, https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/agency-actions-ethylene-oxide (last visited Dec. 10, 2020).

4.     While EPA has failed to act, a pandemic has worsened the harm for communities where, research shows, air pollution has increased mortality from COVID-19.[1]  Communities exposed to these chemical plants' emissions, who are disproportionately communities of color and low-income, need EPA to fulfill its overdue legal obligations to review and revise the emission standards, and performance standards applicable to these facilities, so they can finally breathe clean and healthy air.

5.     In particular, § 7412(d)(6) of the Clean Air Act requires the Administrator to "review, and revise as necessary" emission standards for hazardous air pollutants at least every eight years after the promulgation of standards under § 7412.  Section 7412(f)(2) requires the Administrator to review the health and environmental risk that remain under the existing standards, and promulgate standards to protect public health and the environment (or promulgate a determination that such standards are not required) within eight years after the promulgation of standards under § 7412(d). Yet, more than eight years have passed since EPA's last § 7412(d)(6) review rulemaking for SOCMI sources and EPA has not reviewed and revised such standards, or promulgated a determination that no such revisions are necessary, as required under § 7412(d)(6) for the SOCMI source categories listed in Table A (¶ 54, below).  And, more than eight years have passed since EPA promulgated standards under § 7412(d) for SOCMI sources, yet EPA has not reviewed the health and environmental risk from these sources, or promulgated standards to protect public health and the environment (or a determination that no such standards are required), under § 7412(f)(2) for the SOCMI source categories listed in Table A (¶ 54, below).

---

[1] *See, e.g.*, Michael Petroni *et al.*, *Hazardous air pollutant exposure as a contributing factor to COVID-19 mortality in the United States*, 15 Envtl. Res. Lett. (Sep. 11, 2020), https://iopscience.iop.org/article/10.1088/1748-9326/abaf86.

6.     Additionally, § 7411 of the Clean Air Act requires the Administrator to review and revise NSPS standards for regulated source categories at least every eight years.  42 U.S.C. § 7411(b)(1)(B). Yet, more than eight years have passed since EPA promulgated standards under § 7411(b)(1) and EPA has not reviewed and revised those NSPS standards or promulgated a determination that revised standards are not necessary for the SOCMI source categories listed in Table B (¶ 63, below).

7.     Due to the Defendant Administrator's failures to act to control these chemical plants' emissions, Plaintiffs Texas Environmental Justice Advocacy Services, California Communities Against Toxics, Environmental Integrity Project, Louisiana Environmental Action Network, Ohio Valley Environmental Coalition, RISE St. James, and Sierra Club (collectively, "Plaintiffs") seek both a determination that the Defendant Administrator's failures to perform each action required by 42 U.S.C. §§ 7412(d)(6), 7412(f)(2), and 7411(b) violate the Clean Air Act, and an order to compel the Administrator to take each of these required actions in accordance with an expeditious deadline set by this Court.

## JURISDICTION AND VENUE

8.     This action arises under the Clean Air Act, 42 U.S.C. § 7412(d)(6), (f)(2), and 42 U.S.C. § 7411(b).

9.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a)(2), and 28 U.S.C. §§ 1331 and 1361.

10.     This Court may order the Administrator to perform the requisite acts and duties, may issue a declaratory judgment, and may grant further relief pursuant to 42 U.S.C. § 7604(a), the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and 28 U.S.C. § 1361.

11.     Plaintiffs have a right to bring this action pursuant to the Clean Air Act, 42 U.S.C. § 7604(a)(2), 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

12.     By certified letter to the Administrator posted on October 19, 2020, Plaintiffs gave notice of this action as required by 42 U.S.C. § 7604(b)(2) and 40 C.F.R. §§ 54.1-54.3.

13.     As sixty days have passed since this submission, Plaintiffs have satisfied the notice requirements in 42 U.S.C. § 7604(b)(2).

14.     Venue is vested in this Court under 28 U.S.C. § 1391(e) because the Defendant, EPA Administrator Andrew Wheeler, resides in this district.

## PARTIES

15.     Plaintiff Texas Environmental Justice Advocacy Services ("t.e.j.a.s.") is a nonprofit organization, with its headquarters in Houston, Texas. T.e.j.a.s. promotes environmental protection and environmental justice through education, policy development, community outreach, and legal action to ensure that everyone, regardless of race or income, is entitled to live in a clean environment.

16.     Plaintiff California Communities Against Toxics ("CCAT") is a nonprofit organization based in California. It is an environmental justice network of members and member groups that advocates for environmental justice and protection from toxic air pollution in the State of California and nationally. Through public education, advocacy, and community organizing, CCAT aims to reduce individuals' exposure to pollution, to expand knowledge about the effects of toxic chemicals on human health and the environment, and to protect the most vulnerable people from harm.

17.     Plaintiff Environmental Integrity Project ("EIP") is a non-profit, nonpartisan organization based in Washington, D.C. that empowers communities and protects public health

and the environment by investigating polluters, holding them accountable under the law, and strengthening public policy on toxic air pollution and other environmental health issues. EIP advocates for more effective enforcement of environmental laws.

18.     Plaintiff Louisiana Environmental Action Network ("LEAN") is a nonprofit corporation based in Louisiana which works with its members and community groups in Louisiana and the Gulf to develop, implement, protect, and enforce legislative and regulatory environmental safeguards.  Through education, empowerment, advocacy, and support, LEAN provides tools and services to its members, including individuals and communities facing environmental problems and works to improve the environment for the benefit of all the people of Louisiana.

19.     Plaintiff Ohio Valley Environmental Coalition ("OVEC") is a grassroots nonprofit based in West Virginia.  OVEC is dedicated to the improvement and preservation of the environment and communities through education, grassroots organizing and coalition building, leadership development, strategic litigation, and media outreach.

20.     Plaintiff RISE St. James is a faith-based grass-roots organization formed to advocate for racial and environmental justice in St. James, Louisiana. RISE St. James focuses on protecting the air, water, soil, and environment of St. James Parish from toxic pollution emitted by the petrochemical industry. RISE St. James works on behalf of its members who live in the shadows of current petrochemical facilities and face health threats from existing and newly proposed facilities.

21.     Plaintiff Sierra Club is a nonprofit corporation with its headquarters located in Oakland, California. The Sierra Club is a national membership organization dedicated to the protection of public health and the environment, including clean air, with chapters in Texas,

Louisiana, West Virginia, and other states, and with more than 800,000 members who reside in all 50 states, the District of Columbia, and U.S. territories.

22.     Plaintiffs' longstanding work includes providing information, services, and support to assist constituents and members with understanding and reducing the air pollution exposure and health impacts they face from chemical and petrochemical plants in their state or region.  Plaintiffs are engaged as part of their core mission in work to strengthen national air standards for other similar chemical plants, including some that are collocated with the sources at issue in this complaint.  For example, RISE St. James and Sierra Club are currently working to raise awareness and provide information and assistance to members to oppose the proposed Formosa Plastics petrochemical complex that would be a source regulated by the SOCMI standards, if it were allowed to be built.  Plaintiffs are also involved in active work, including litigation, to strengthen one or more of EPA's recently issued national air toxics standards which regulate similar facilities, and that show the need to strengthen the rules for the chemical plants at issue here.  Plaintiffs have also worked and are actively working to prevent and reduce fires, explosions, and toxic leaks at chemical plants.  *See, e.g.*, *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1065-67 (D.C. Cir. 2018).  Some Plaintiffs, including t.e.j.a.s., Sierra Club, LEAN, CCAT, and EIP have won cases in recent years that are cited later in this complaint as part of the precedent that shows the need to strengthen the rules at issue in this case.

23.     Defendant Andrew Wheeler is the Administrator of the EPA.  In that role he is charged with the duty to uphold the Clean Air Act and to take required regulatory actions according to the schedules established therein. 42 U.S.C. § 7601.

## LEGAL FRAMEWORK

24.     The Clean Air Act's purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  A "primary goal" of the Act is "pollution prevention."  *Id.* § 7401(c).  Congress enacted this law in part because "the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare."  *Id.* § 7401(a)(2).  To accomplish its objectives, the Act prescribes a regulatory framework within which EPA is required to set emission and performance standards by specific deadlines to reduce emissions of "hazardous" and other harmful air pollutants and protect public health and the environment.  *Id.* §§ 7412, 7411.

### Section 7412: Air Toxics Emission Standards

25.     In the 1990 Clean Air Act Amendments, Congress strengthened § 7412 and established new requirements for EPA to control toxic air pollution.  By statute, Congress listed air pollutants that it determined to be "hazardous" for regulation, and required EPA to list any other compound "known to cause or [that] may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects."  *Id.* § 7412(b)(1), (b)(3)(B); *see also id.* § 7412(a)(6); § 7602(g).

26.     The Act requires EPA to list categories of sources of all hazardous air pollutants.  42 U.S.C. § 7412(c)(1).  According to deadlines provided in the Act, EPA must then promulgate emission standards for each listed category or subcategory of such major and area sources of hazardous air pollutants.  *Id.* § 7412(d); *id.* § 7412(a)(1) (definition of major source). The standards for major sources, often referred to as "maximum achievable control technology" or

"MACT" standards, must require "the maximum degree of reduction in emissions of . . . hazardous air pollutants . . . that is achievable . . . ," *id.* § 7412(d)(2). The "floor" or minimum stringency required must reflect what the best controlled source or sources have "achieved." *Id.* § 7412(d)(3).

27.     Once the Administrator has promulgated emission standards pursuant to § 7412 for a source category, EPA must assure such standards continue to strengthen over time.  First, "[t]he Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every [eight] years." *Id.* § 7412(d)(6).  In addition to revising standards to reflect control "developments," § 7412(d)(6) requires EPA to make all revisions that are "necessary" to bring standards into full compliance with the Clean Air Act, such as setting limits on all uncontrolled HAP emissions, *see Louisiana Envtl. Action Network v. EPA*, 955 F.3d 1088, 1096 (D.C. Cir. 2020) [hereinafter "*LEAN*"], and removing all illegal exemptions or loopholes, *see, e.g.*, *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008).  This provision requires the Administrator to promulgate revised § 7412(d) standards or to issue a final determination that revision is not "necessary" to ensure the emission standards satisfy § 7412(d) of the Act. § 7412(d)(6).

28.     Second, § 7412(f) of the Act requires further action "to protect health and environment."  It mandates that EPA first submit a report to Congress regarding residual risk or "the risk to public health remaining, or likely to remain" after the application of § 7412(d) standards. *Id.* § 7412(f)(1).  In 1999, EPA submitted a report to Congress pursuant to § 7412(f)(1).  *See* EPA, *Residual Risk Report to Congress,* EPA-453/R-99-001 (Mar. 1999),

http://www.epa.gov/airtoxics/rrisk/risk_rep.pdf.  Congress did not act on that report's

recommendations.

29.     That inaction triggered the duty of the Administrator to review the remaining

health and environmental risks and promulgate residual risk standards under § 7412(f)(2), if

required "to provide an ample margin of safety to protect public health . . . or to prevent, taking

into consideration costs, energy, safety, and other relevant factors, an adverse environmental

effect," for source categories for which EPA has promulgated § 7412(d) standards, or to issue a

final determination that revision is not required.  42 U.S.C. § 7412(f)(2).  Section 7412(f)(2)

directs that:

> (A)     If Congress does not act on any recommendation submitted
> under paragraph (1), *the Administrator shall, within 8 years after
> promulgation* of standards for each category or subcategory of
> sources pursuant to [§ 7412(d)], promulgate standards for such
> category or subcategory if promulgation of such standards is
> required in order to provide an ample margin of safety to protect
> public health in accordance with this section … or to prevent,
> taking into consideration costs, energy, safety, and other relevant
> factors, an adverse environmental effect.  Emission standards
> promulgated under this subsection shall provide an ample margin
> of safety to protect public health in accordance with this section (as
> in effect before November 15, 1990) …. If standards promulgated
> pursuant to [§ 7412(d)] and applicable to a category or subcategory
> of sources emitting a pollutant (or pollutants) classified as a
> known, probable or possible human carcinogen do not reduce
> lifetime excess cancer risks to the individual most exposed to
> emissions from a source in the category or subcategory to less than
> one in one million, *the Administrator shall promulgate standards
> under this subsection for such source category.*
>
> …
>
> (C)     The Administrator *shall determine whether or not to
> promulgate such standards and*, if the Administrator decides to
> promulgate such standards, *shall promulgate the standards 8 years
> after promulgation* of the [§ 7412(d) standards] for each source
> category or subcategory concerned.

*Id.* (emphasis added).

30.     Thus, if residual risk standards are "required in order to provide an ample margin of safety to protect public health" or "to prevent … an adverse environmental effect," then the Administrator "shall" promulgate these standards within eight years of the promulgation of § 7412(d) standards.  *Id.* § 7412(f)(2)(A).  Under § 7412(f)(2), EPA is therefore required either to set new standards that will protect the public with an ample margin of safety or prevent an adverse environmental effect, or to determine such standards are not required.

31.     Section 7412(d) and § 7412(f) standards become effective "upon promulgation." *See id.* § 7412(d)(10), (f)(3); *see also id.* § 7412(f)(4) (setting compliance dates for § 7412(f) standards); *id.* § 7412(i) (setting compliance schedule for § 7412(d) standards).

## Section 7411: Performance Standards

32.     As a complementary provision, Congress enacted § 7411's New Source Performance Standards program to regulate each stationary source that EPA finds "causes, or contributes significantly to, air pollution, which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7411(b)(1)(A).  Section 7411(b) of the Act specifically governs new or modified sources – those built or modified after the publication of regulations that would apply to that source.  *Id.* § 7411(a)(2).

33.     Within one year after adding a stationary source category to its list of categories under § 7411(b)(1)(A), EPA must publish proposed regulations known as New Source Performance Standards ("NSPS").  *Id.* § 7411(b)(1)(B).  EPA must promulgate final standards within one year of the publication of the proposed regulation.  *Id.*

34.     The Act further requires EPA, at least every eight years, to "review and, if appropriate, revise such standards" or promulgate a determination that revision "is not appropriate in light of readily available information on the efficacy of such standard."  *Id.*

35.     Section 7411(b) standards become effective "upon promulgation."  *Id.*

36.     For each of the above-described § 7412 and § 7411 rulemakings, the Act grants the public the right to present their views and information to EPA and have these considered by the agency during the rulemakings.  The Act applies § 7607(d)'s special rulemaking requirements to "the promulgation or revision of any standard of performance under § 7411 of this title, or emission standard or limitation under § 7412(d) of this title, any standard under § 7412(f) of this title," among others.  *Id.* § 7607(d)(1)(C).  Section 7607(d) requires EPA to provide public notice of proposed rulemaking accompanied by a statement of its basis and purpose, which must include the factual data on which the proposed rule is based and the methodology used in obtaining and analyzing the data.  *Id.* § 7607(d)(3).  Section 7607(d) also requires EPA to allow any person to submit written comments, data, or documentary information, and to present data, views, or arguments orally.  *Id.* § 7607(d)(5); *see also id.* § 7607(h) (requiring at least 30-day comment period to ensure "meaningful public participation").  EPA must consider these comments, data, and arguments, and respond to each of the significant comments, criticisms, and new data in the public docket when promulgating the final rule to assure for meaningful judicial review.  *Id.* § 7607(d)(6)(B).

## FACTS

### Overdue EPA Nondiscretionary Duties Under § 7412

37.     EPA listed the SOCMI source category as a major source of hazardous air pollutants in 1992.  EPA, Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 31,576 (July 16, 1992). EPA has recognized that these emissions include at least 130 dangerous pollutants such as ethylene oxide, benzene, 1,3-butadiene, and formaldehyde. 40 C.F.R. Pt. 63, Subpt. F, Tbl. 2 (listing pollutants regulated

under the HON Rule); EPA, National Emission Standards for Hazardous Air Pollutants for Source Categories; Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry and Other Processes Subject to the Negotiated Regulation for Equipment Leaks, Final Rule, 59 Fed. Reg. 19,402 (Apr. 22, 1994).

38.     EPA described the SOCMI source category as notable because it "emits a large volume and variety of HAP's relative to other source categories" and recognized that "SOCMI sources tend to be located in close proximity to populations."  EPA, National Emission Standards for Hazardous Air Pollutants for Source Categories; Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry and Seven Other Processes, Proposed Rule, 57 Fed. Reg. 62,608, 62,610 (Dec. 31, 1992).

39.     EPA first promulgated standards for this source category in 1994.  *See* 59 Fed. Reg. at 19,402.  Also known as the "Hazardous Organic NESHAP" or "HON" Rule, this rule is comprised of four sections: Subparts F, G, H, and I.

40.     Subpart F includes a list of 380 synthetic organic chemicals produced by these chemical plants as commercial products, where the production process may result in organic HAP emissions (a list of the 130 potential HAPs is also included Appendix Table 2 to Subpart F). *See* 40 C.F.R. Pt. 63, Subpt. F, Tbl. 2.  Subpart F also defines source for the SOCMI source category as the set of process vents, storage vessels, transfer racks, wastewater streams, and equipment leaks in the chemical processes subject to the HON.  40 C.F.R. § 63.101.

41.     Subpart G includes specific provisions for process vents, wastewater, storage vessels, and transfer operations.  40 C.F.R. §§ 63.110-63.153.

42.     Subparts H and I provide additional provisions for equipment leaks.  40 C.F.R. §§ 63.160-63.193.

43.     On December 21, 2006, the Administrator reviewed the standards under

§ 7412(d)(6) and promulgated NESHAP standards under § 7412(d)(2) for the SOCMI source

category. EPA, National Emission Standards for Organic Hazardous Air Pollutants from the

Synthetic Organic Chemical Manufacturing Industry, 71 Fed. Reg. 76,603 (Dec. 21, 2006)

(revising standards for wastewater streams and changing requirements for certain owners or

operators and off-site reloading and cleaning operations); 40 C.F.R. §§ 63.100-63.193.

44.     Additionally, EPA further amended the equipment leak standards in Subparts G

and H of the HON Rule on December 22, 2008.  EPA, Alternative Work Practice to Detect

Leaks from Equipment, 73 Fed. Reg. 78,199 (Dec. 22, 2008).

45.      As a result of the 2006 action, the Administrator was required to "review, and

revise as necessary" the standards for the SOCMI source category under § 7412(d)(6) by

December 21, 2014, *i.e.*, within 8 years.

46.     The Administrator did not review and promulgate revisions or promulgate a

determination that no revisions were necessary between 2006 and by December 21, 2014.

47.     The Administrator has not taken such action since that time.

48.     Therefore, the Administrator has violated and is in ongoing violation of his

statutory duty under § 7412(d)(6) for the SOCMI source category.

49.     As a result of the 2006 promulgation of § 7412(d) standards, the Administrator

was also required to assess the remaining health and environmental risks and promulgate residual

risk standards under § 7412(f)(2), or promulgate a determination that such standards were not

required for the SOCMI source category within eight years, or by December 21, 2014.

50.     The 2008 promulgation of § 7412(d) standards also triggered a residual health and

environmental risk review duty under § 7412(f)(2) within eight years, or by December 22, 2016.

51.     The Administrator did not review and promulgate § 7412(f)(2) standards or promulgate a determination that no such standards were required between 2006 and the deadlines of December 21, 2014 or December 22, 2016.

52.     The Administrator has not taken such action since that time.

53.     Therefore, the Administrator has violated and is in ongoing violation of its statutory duty under § 7412(f)(2) for the SOCMI source category.

54.     The following Table A lists EPA's overdue nondiscretionary duties under § 7412 to perform air toxics rulemakings for the SOCMI source categories:

| Table A:  § 112 Source Categories Covered By This Complaint | | | |
|---|---|---|---|
| Source Category | Date Of Promulgation | Deadline For Action Pursuant To § 7412(d)(6) | Deadline For Action Pursuant To § 7412(f)(2) |
| 1.  National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry, 59 Fed. Reg. 19,454 (codified at 40 C.F.R. Pt. 63 Subpt. F, 40 C.F.R. §§ 63.100-63.107) | Final Rule, 71 Fed. Reg. 76,603 (Dec. 21, 2006) | Dec. 21, 2014 | Dec. 21, 2014 |
| 2.  National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater, 59 Fed. Reg. 19,468 (codified at 40 C.F.R. Pt. 63, Subpt. G, 40 C.F.R. §§ 63.110-63.163) | Final Rule, 71 Fed. Reg. 76,603 (Dec. 21, 2006), and 73 Fed. Reg. 78,199 (Dec. 22, 2008) | Dec. 21, 2014 | Dec. 21, 2014; Dec. 22, 2016 |

| Table A:  § 112 Source Categories Covered By This Complaint | | | |
|---|---|---|---|
| **Source Category** | **Date Of Promulgation** | **Deadline For Action Pursuant To § 7412(d)(6)** | **Deadline For Action Pursuant To § 7412(f)(2)** |
| 3.   National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks, 59 Fed. Reg. 19,568 (codified at 40 C.F.R. Pt. 63, Subpt. H, 40 C.F.R. §§ 63.160-63.183) | Final Rule, 71 Fed. Reg. 76,603 (Dec. 21, 2006), and 73 Fed. Reg. 78,199 (Dec. 22, 2008) | Dec. 21, 2014 | Dec. 21, 2014; Dec. 22, 2016 |
| 4.   National Emission Standards for Organic Hazardous Air Pollutants for Certain Processes Subject to the Negotiated Regulation for Equipment Leaks, 59 Fed. Reg. 19,587 (codified at 40 C.F.R Pt. 63, Subpt. I, 40 C.F.R. §§ 63.190-63.193) | Final Rule, 71 Fed. Reg. 76,603 (Dec. 21, 2006) | Dec. 21, 2014 | Dec. 21, 2014 |

### Overdue EPA Nondiscretionary Duties under § 7411

55.     The SOCMI sources also emit other types of pollutants, including volatile organic compounds, which are regulated under § 7411 of the Clean Air Act. *See, e.g.*, EPA, Standards of Performance for Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry, Final Rule, 72 Fed. Reg. 64,860, 64,864 (Nov. 16, 2007) (40 C.F.R. Pt. 60 Subpts. VV and VVa).

56.     The Administrator has promulgated standards of performance for four categories of new stationary SOCMI sources.

57.     In particular, EPA promulgated NSPS for Air Oxidation Processes, 40 C.F.R. Pt. 60 Subpt. III, 40 C.F.R. §§ 60.610-60.618; Distillation Operations, 40 C.F.R. Pt. 60 Subpt. NNN, 40 C.F.R. §§ 60.660-60.668; and Reactor Processes, 40 C.F.R. Pt. 60 Subpt. RRR, 40 C.F.R.

§§ 60.700-60.708, on December 14, 2000.  EPA, Consolidated Federal Air Rule; Synthetic

Organic Chemical Manufacturing Industry, 65 Fed. Reg. 78,275 (Dec. 14, 2000).

58.     EPA promulgated standards of performance for Equipment Leaks, 40 C.F.R. Pt.

60 Subpts. VV-VVa, 40 C.F.R. §§ 60.480-60.489, 60.480a.-60.489a, on November 16, 2007. 72

Fed. Reg. 64,860.

59.     The Administrator was required to "review and, if appropriate, revise such

standards" under § 7411(b), or promulgate a determination that such standards were not

appropriate, for the SOCMI source categories regulated in Subparts III, NNN, and RRR within

eight years, or by December 14, 2008.

60.     The Administrator was required to take final action to fulfill his § 7411(b) duties

for the SOCMI stationary source categories regulated in Subparts VV-VVa by November 16,

2015.

61.     The Administrator did not review and revise the SOCMI NSPS for Subparts III,

NNN, and RRR nor promulgate a determination that no revisions were necessary by the deadline

of December 14, 2008.

62.     The Administrator did not review and revise the SOCMI NSPS for Subparts VV-

VVa nor promulgate a determination that no revisions were necessary by the deadline of

November 16, 2015.

63.     Therefore, EPA has violated and is in ongoing violation of its statutory duties

under § 7411(b) as summarized in Table B, below:

16

| Table B:  § 111 Source Categories Covered By This Complaint | | |
|---|---|---|
| **Source Category** | **Date Of Promulgation** | **Deadline For Action Pursuant To § 7411(b)(1)** |
| 1.   SOCMI Air Oxidation Unit Processes, 65 Fed. Reg. 78,275 (codified at 40 C.F.R. Pt. 60 Subpt. III, 40 C.F.R. §§ 60.610-60.618) | Dec. 14, 2000 | Dec. 14, 2008 |
| 2.   SOCMI Distillation, 65 Fed. Reg. 78,275 (codified at 40 C.F.R. Pt. 60 Subpt. NNN, 40 C.F.R. §§ 60.660-60.668) | Dec. 14, 2000 | Dec. 14, 2008 |
| 3.   SOCMI Reactor Processes, 65 Fed. Reg. 78,275 (codified at 40 C.F.R. Pt. 60 Subpt. RRR, 40 C.F.R. §§ 60.700- 60.708) | Dec. 14, 2000 | Dec. 14, 2008 |
| 4.   SOCMI Equipment Leaks, 72 Fed. Reg. 64,860 (codified at 40 C.F.R. Pt. 60 Subpt. VV-VVa, 40 C.F.R. §§ 60.480- 60.489, 40 C.F.R. § 60.480a.- 60.489a) | Nov. 16, 2007 | Nov. 16, 2015 |

64.     In regard to each of the § 7412 and § 7411 obligations described in ¶¶ 37-64, above, EPA has failed to act and is in continuing violation of each of these obligations and therefore has failed to perform a nondiscretionary duty within the meaning of § 304 of the Act. 42 U.S.C. § 7604(a)(2).

**Health Effects of Chemical Plants' Air Pollution**

65.     There are about 315 existing SOCMI chemical plants regulated by the HON Rule.[2]

---

[2]  Lists created by searching EPA's ECHO website for sources listed as major sources regulated under MACT Subparts F, G, H, and/or I.  *See* EPA, Enforcement and Compliance History Online (ECHO), https://echo.epa.gov/.

66.     There are an additional about 255 chemical plants regulated by the SOCMI NSPS.[3]

67.     The petrochemical industry has planned many new or expanded plants to begin operation between now and 2025, particularly in Texas and Louisiana, which will emit substantial amounts of greenhouse gases and cause severe local pollution.[4] One such example is the massive Formosa Plastics petrochemical complex in St. James, Louisiana, which includes SOCMI units.

68.     Hazardous air pollutants emitted by SOCMI sources can cause serious acute and chronic human health effects, including cancer, difficulty breathing, immune, developmental impacts, and other harm.[5]

69.     EPA has long recognized that carcinogens have no safe level of human exposure and cancer risk is additive.

70.     Prenatal exposure to carcinogens and other air pollutants and exposure during early childhood increases an individual's lifetime cancer and other health risks due to greater vulnerability to harm from pollution during early stages of development.

---

[3] Lists created by searching EPA's ECHO website for sources listed as major sources regulated under NSPS Subparts III, NNN, RRR, VV, and/or VVa. *Id.*

[4] EIP, Greenhouse Gases from Oil, Gas, and Petrochemical Production: Fracking Boom Fuels Rise in Greenhouse Gases and Health-Damaging Pollutants 6-7, 24 (Jan. 8, 2020), https://www.environmentalintegrity.org/wp-content/uploads/2020/01/Greenhouse-Gases-from-Oil-Gas-and-Petrochemical-Production.pdf (as well as Ohio, Pennsylvania, and West Virginia); EIP, Plastics Pollution on the Rise: Growth of Houston-Area Plastics Industry Threatens Air Quality and Public Safety 4-5, 16 (Sep. 2019), https://environmentalintegrity.org/wp-content/uploads/2019/09/Plastics-Pollution-on-the-Rise-report-final.pdf.

[5] EPA, Integrated Risk Inhalation System (IRIS) Assessments, https://iris.epa.gov/AtoZ/?list_type=alpha (last visited Dec. 7, 2020) (noting status of carcinogen for many HAPs emitted by SOCMI facilities, including 1,3-Butadiene, Acrylamide, Ethylene Oxide, and Chloroform).

71.     Socioeconomic disparities and related stressors increase vulnerability to carcinogenic and other toxic exposures.

72.     One highly potent carcinogen emitted by SOCMI facilities is ethylene oxide.

73.     In 2016, EPA scientists in the Integrated Risk Information System (IRIS) determined that this pollutant has a risk value that is 30 times more potent than previously known and elevated this pollutant from a probable carcinogen to one known to be carcinogenic to humans.

74.     Applying that new, higher cancer risk value along with other current cancer risk information in the 2018 National Air Toxics Assessment showed that there are community hot spots for cancer risk – places where cancer risk is higher than EPA's own benchmark of presumed unacceptable cancer risk.[6]

75.     Due to the results of this assessment, EPA announced that it is "working with industry, and state, local and tribal air agencies to address this chemical."[7]  EPA's web page lists the SOCMI/HON Rule as one that regulates ethylene oxide-emitting sources that EPA states it plans to review to address the health threats.

76.     EPA's Office of Inspector General advised EPA to communicate with communities exposed to ethylene oxide-emitting chemical plants, including some that are SOCMI sources that EPA identified as "high-priority" due to the health risks.  EPA OIG Report

---

[6] EPA, 2014 National Air Toxics Assessment (NATA) (Aug. 2018), https://www.epa.gov/national-air-toxics-assessment/2014-national-air-toxics-assessment; *see also* Sharon Lerner, *A Tale of Two Toxic Cities: The EPA's Bungled Response to an Air Pollution Crisis Exposes a Toxic Racial Divide*, The Intercept (Feb. 24, 2019), https://theintercept.com/2019/02/24/epa-response-air-pollution-crisis-toxic-racial-divide/ (providing list of 108 cancer risk hot spots).

[7] EPA, Hazardous Air Pollutants: Ethylene Oxide, https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide (last viewed Dec. 16, 2020).

No. 20-N-0128 at 5 & App. A (Mar. 31, 2020), https://www.epa.gov/office-inspector-general/report-management-alert-prompt-action-needed-inform-residents-living-near.

77.     In May 2019, the National Environmental Justice Advisory Council ("NEJAC") submitted advice to EPA to provide information to communities regarding, and to review and strengthen, the HON Rule for SOCMI sources, due to the high health threats from ethylene oxide.  NEJAC, Letter to Andrew Wheeler, EPA Admin. at 4 (May 3, 2019), https://www.epa.gov/sites/production/files/2019-08/documents/nejac-letter-ethylene_oxide-may-3-2019-final.pdf.

78.     In July 2019, EPA responded to the NEJAC's letter, stating that: "Addressing this chemical [ethylene oxide] is a high priority for the [EPA]" and that EPA was "evaluating possible schedules" for all of the ethylene oxide-emitting source categories, including SOCMI. EPA, Letter to Richard Moore, Chair of NEJAC at 1 (July 19, 2019), https://www.epa.gov/sites/production/files/2019-08/documents/nejac_final_epa-response-ethylene-oxide-letter.pdf.

79.     Breathing certain SOCMI-emitted pollutants can also cause other kinds of chronic, long-term harm, such as damage to the liver and kidneys; respiratory issues; degeneration of the nervous system; degeneration of the immune system; and developmental and reproductive harms, including birth defects, ovarian damage, and developmental delay.

80.     In addition, breathing some of these pollutants can cause severe or acute harm from short-term exposure, such as difficulty breathing or decline in neurobehavioral performance.

81.     Some of the hazardous air pollutants emitted from the SOCMI sources persist in the environment or bioaccumulate.

82.     People who eat locally grown fish or vegetables, and children playing on the playground who put their hands to their mouths ingest chemical plants' pollution after it deposes in water or soil, as an additional pathway of toxic exposure.

83.      People living near multiple SOCMI plants are not only exposed to multiple sources, but also to multiple pollutants, and through multiple routes of exposure.

84.     In addition, EPA has found that volatile organic compounds, emitted by SOCMI plants, are precursors to the formation of ozone in the ambient air.

85.     Ambient ozone can cause or worsen asthma attacks, lung inflammation, reduction of lung function, respiratory symptoms (*e.g.*, cough, chest pain, throat and nose irritation), and increase lung permeability.

86.      Both short-term and long-term exposure to ozone is associated with increased hospitalizations and deaths from respiratory causes. *See* EPA, National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292, 65,307-08 (Oct. 26, 2015).

87.      As EPA has repeatedly recognized, children are especially vulnerable to the harmful effects of ozone, including asthma. *See, e.g.*, *id.* at 65,310/3, 65,446/1. Asthma-related hospitalizations and deaths are elevated among children, particularly among Black children. EPA, Ozone NAAQS, Final Rule, 62 Fed. Reg. 38,856, 38,864 (July 18, 1997). In fact, "Black children are two times as likely to be hospitalized for asthma and are four times as likely to die from asthma as White children." EPA, *Children's Environmental Health Disparities: Black and African American Children and Asthma* 3, https://www.epa.gov/sites/production/files/2014-05/documents/hd_aa_asthma.pdf (accessed December 11, 2020).

88.     EPA has found that ozone can also damage vegetation including forests, commercial trees, and agricultural crops, and result in damage to ecosystems.

89.     Some communities currently out of attainment with EPA's National Ambient Air Quality Standards for Ozone due to unhealthy air quality include one or more SOCMI plants, including about eighty such facilities in the Houston-Galveston-Brazoria, Texas nonattainment area alone. *See* EPA, Current Nonattainment Counties for All Criteria Pollutants (updated Nov. 30, 2020), https://www3.epa.gov/airquality/greenbook/ancl.html.

90.     There are some emission points and emissions in the SOCMI source categories that are uncontrolled by the existing HON Rule.

91.     For example, there are currently "no control" standards for sources such as certain process vents, storage vessels, transfer racks, and wastewater streams categorized as "group 2 emission points."  59 Fed. Reg. at 19,403, 19,405 ("controls are not required for Group 2 emission points").

92.     Communities near SOCMI plants are also exposed to spikes in dangerous pollution from uncontrolled releases during upsets and malfunctions.

93.     The existing HON Rule and SOCMI NSPS contain exemptions from the standards for air pollution releases during "startup, shutdown, or malfunction" (SSM) periods. *See, e.g.*, 40 C.F.R. § 63.102(a)(1) (providing that standards "shall apply at all times except during periods of start-up or shutdown . . . , [or] malfunction"); *see also e.g.*, 40 C.F.R. § 60.482-1(e) (exempting equipment in VOC service only "during process malfunctions"); 40 C.F.R. § 65.3 (alternative compliance option incorporated into NSPS).

94.     The D.C. Circuit held this type of exemption is unlawful because air emission standards must be "continuous" and "apply at all times." *Sierra Club*, 551 F.3d at 1028 (citing 42 U.S.C. § 7602(k)).

95.     EPA has not revised the standards to remove the startup, shutdown, malfunction

exemptions from the NESHAP or NSPS for SOCMI chemical plants.

96.     These exemptions for SOCMI facilities are particularly harmful in the hurricane-

prone areas like the Gulf of Mexico, where communities face the double burden of a storm plus

harmful air pollution and even disasters like fires and explosions.[8]

### Revision Rulemakings

97.     The existing §§ 7411 and 7412 regulations for SOCMI chemical plants and units

contain outdated provisions that EPA would likely be required to revise and strengthen in the

overdue rulemakings – such that these rulemakings would likely lead to reductions in air

pollution and the avoidance or reduction of exposure to such pollution for people living near

these sources.

98.     For example, in the overdue § 7412(d)(6) review, EPA would be required to set

limits on all currently uncontrolled HAP emissions from the HON/SOCMI source category, and

to remove the unlawful exemptions the current rules contain for excess emissions during startup

shutdown, and malfunction periods.  *See LEAN*, 955 F.3d at 1096; *Sierra Club*, 551 F.3d at

1027-28.

99.     EPA would also be required to "tak[e] into account developments," 42 U.S.C.

§ 7412(d)(6), such as fenceline monitoring and corrective action for fugitive air emissions of

benzene, which EPA has put in place at a similar source – petroleum refineries – as a way of

assuring compliance with the emission standards. EPA, Petroleum Refinery Sector Risk and

---

[8] *See, e.g.*, EIP, *Preparing for the Next Storm: Learning from the Man-Made Environmental Disasters that Followed Hurricane Harvey* (Aug. 16, 2018), https://environmentalintegrity.org/wp-content/uploads/2018/08/Hurricane-Harvey-Report-8.16.18-final.pdf.

Technology Review and New Source Performance Standards, 80 Fed. Reg. 75,178 (Dec. 1, 2015).

100.    Further, both the § 7412 HON Rule regulating SOCMI sources[9] and the § 7411 NSPS standards for SOCMI facilities[10] incorporate EPA's general flare standards under 40 C.F.R. § 63.11 and 40 C.F.R. § 60.18, respectively, which are outdated and also decades overdue for review.

101.    On multiple occasions, EPA has recognized that the general flare standards under 40 C.F.R. § 63.11 and 40 C.F.R. § 60.18 are outdated, leading to the operation of flares with poor destruction efficiency, and require revision.

102.    In recent rulemakings for similar chemical and petrochemical source categories, EPA promulgated rules which set out specific revisions that improved flare operational and monitoring requirements in part, and these show some of the essential revisions EPA would likely find necessary after performing its statutorily required reviews under § 7411(b), § 7412(d)(6), and § 7412(f)(2).

103.    Developments have also occurred in leak detection and repair and other types of pollution controls that can achieve lower levels of emissions from SOCMI chemical plants and would be methods EPA would likely consider in the overdue §§ 7412(d)(6), 7411, and 7412(f)(2) rulemakings.

---

[9] For example, at least nine regulations within the HON category standards under 40 C.F.R. Part 63 Subpart G reference the general flare standards under 40 C.F.R. § 63.11. *See* 40 C.F.R. §§ 63.113(a)(1)(i), 63.116(a)(1)-(3), 63.119(e)(1), 63.120(e)(1), (6), 63.122(g)(3), 63.126(b)(2)(i), 63.128(b)(1)-(3), 63.139(a)(3), (d)(3), 63.145(j)(1)-(3).

[10] Similarly, the § 7411 standards for the five SOCMI categories all reference the general flare standards of 40 C.F.R. § 60.18. *See* 40 C.F.R. §§ 60.482-10(d) (Subpt. VV, equipment leaks), 60.482-10a(d) (Subpt. VVa, equipment leaks), 60.612(b) (Subpt. III, Air Oxidation Unit processes), 60.614(d) (same), 60.662(b) (Subpt. NNN, Distillation Operations), 60.664(d) (same), 60.702(b) (Subpt. RRR, Reactor Processes), 60.704(c) (same).

104.    EPA scientists have released new health reference values and new risk assessment guidance on pollutants in recent years based on the best available science – including the 2016 IRIS assessment for ethylene oxide as one example.

105.    Scientific knowledge of carcinogens and other hazardous air pollutants and their effects on human health has advanced in recent years, and the National Academy of Sciences in 2009 recommended that EPA update its health risk assessment approach to better account for vulnerability, uncertainty, and cumulative risks and impacts to people exposed to toxic chemicals.  National Research Council, *Science and Decisions: Advancing Risk Assessment* (2009), http://www.nap.edu/catalog.php?record_id=12209.

106.    In another recent similar rulemaking for sources that are sometimes located at the same industrial complex with SOCMI chemical plants, EPA found that the facility-wide cancer risk to people living nearby was *30 times* EPA's benchmark of unacceptability – 3,000-in-1 million – in part due to emissions from SOCMI chemical plants.  EPA, Miscellaneous Organic Chemical Manufacturing NESHAP, 85 Fed. Reg. 49,084, 49,095-96 (Aug. 12, 2020).

107.    The best available scientific information on SOCMI plants and their emissions and an up-to-date health risk assessment that accounts for the real-world impacts communities face from their pollution would likely lead EPA to find health threats that require EPA to reduce emissions to remove all unacceptable risk, and to assure the "ample margin of safety to protect public health" and prevent an adverse environmental effect in the § 7412(f)(2) rulemaking.

## ALLEGATIONS OF INJURY

108.    Plaintiffs and their members and constituents are and will continue to be harmed by the Administrator's failures to take the actions required by 42 U.S.C. § 7412(d)(6),

§ 7412(f)(2), and § 7411(b) for the SOCMI source categories, 40 C.F.R. Pt. 63 Subpts. F-I, and the SOCMI stationary sources enumerated in Tables A and B, above, as further explained herein.

109.    Plaintiffs' members live, work, travel, recreate, and engage in a variety of other activities near sources in the source category.  Plaintiffs' members suffer exposure and other harm to their health, recreational, aesthetic, educational, professional, and other interests due to breathing the hazardous air pollutants emitted by facilities in the source category, by consuming food contaminated with pollutants from sources in the source category, and by other pathways of exposure as described above.  Exposure to hazardous air pollutants emitted by sources in the source category has adverse health effects, which may include respiratory, neurological, developmental, and reproductive harm; damage to bodily organs and the central nervous system; and cancer, as well as other health effects described above.

110.    Plaintiffs' members are concerned that hazardous air pollutants are present in the locations where they live, work, travel, recreate, and engage in other activities.  These reasonable concerns about their increased exposure from such activities and other resulting harms from such exposure diminish their enjoyment of activities and areas they previously enjoyed or would like to continue to engage in or use, and thereby harm their recreational, aesthetic, educational, professional, and other interests.

111.    Further, SOCMI sources emit air pollutants that can damage surrounding wildlife, plants, waters, land, communities, and ecosystems, and thus harm Plaintiffs' members' recreational, aesthetic, educational, professional, and other interests in those wildlife, plants, waters, land, communities, or ecosystems.  As detailed above, the pollution emitted by SOCMI sources includes hazardous air pollutants and volatile organic compounds, which contribute to ambient ozone that can harm plant species and can result in changes in wildlife habitat.  These

changes can lead to wildlife avoidance of certain areas, as well as a reduction in biodiversity or other changes to a local community's ecosystem.  Ecosystem changes make it more difficult for Plaintiffs' members to observe, fish, cultivate, study, research, or write about wildlife, plants, or ecosystems.

112.    Plaintiffs and their members suffer additional harm because they do not have up-to-date information, published findings, or determinations from the Administrator regarding the emission limitations existing sources have achieved, the current pollution control methods, practices, and technologies that could or are being used to achieve emission reductions, the health and environmental risks that remain under the existing standards, or other information relevant to the need for stronger emission and performance standards.  This information would be provided to Plaintiffs, their members, and other interested members of the public as a result of the Administrator's required actions pursuant to § 7412(d)(6), § 7412(f)(2), and § 7411(b).  *See, e.g.*, 42 U.S.C. § 7607(d)(3)-(6) (describing notice and informational disclosures required as part of rulemakings under §§ 7412, 7411).

113.    If Plaintiffs and their members had this information, they would use it to work for stronger health and environmental protections; to educate members, supporters, and the public pursuant to their organizational missions; and to protect themselves and their families from air pollutants and affected land, water, and food.  The denial of this information impairs Plaintiffs' ability to provide information and services to their members to assist them in protecting their interests, hampers the ability of Plaintiffs and their members to take actions to protect their health and communities, and diminishes their enjoyment of activities in their daily lives.

114.    Plaintiffs and their members suffer harm because they are denied the opportunity to submit written comments, data, and documentary information to EPA and to present data,

views, or arguments to EPA and have them considered by EPA and responded to as part of the overdue § 7412(d)(6), § 7412(f)(2), and § 7411(b) rulemakings.  The Administrator's failures to conduct the overdue rulemakings have denied Plaintiffs and their members the opportunity to seek greater health protections and emissions reductions, and to have EPA consider and respond to such comments in taking the final actions required by § 7412(d)(6), § 7412(f)(2), and § 7411(b).  Deprivation of the ability to present comments and arguments and have them considered and addressed by EPA impairs Plaintiffs' and their members' ability to serve and protect their interests and fulfill their organizational missions.

115.    Plaintiffs and their members suffer harm because the Administrator has not issued final rules or determinations under § 7412(d)(6), § 7412(f)(2), and § 7411(b)(1)(B) addressing and including all matters these provisions require, as discussed above.  Any such rule or determination would be judicially reviewable.  *See id.* § 7607(b).  Deprivation of the right to judicial review harms the ability of Plaintiffs and their members to protect their interests and fulfill their organizational missions.

116.    The Administrator's failures to take actions required by § 7412(d)(6), § 7412(f)(2), and § 7411(b)(1)(B) deprive Plaintiffs' members of the cleaner air that would result from those actions.  Consequently, Defendant prolongs and increases Plaintiffs' members' exposure to hazardous air pollutants, volatile organic compounds that contribute to ozone, and the related and resulting health, recreational, aesthetic, and other injuries as described above.  Defendant also prolongs and increases the air pollutant exposure of wildlife, plant, water, land, local communities, and ecosystems, resulting in harm to Plaintiffs' members' interests, as described above.  Emission reductions required under § 7412(d)(6), § 7412(f)(2), and

§ 7411(b)(1)(B), would reduce these exposures, and would reduce the related health, recreational, aesthetic, and other harms suffered by Plaintiffs' members.

117.    By not taking the actions required by § 7412(d)(6), § 7412(f)(2), and § 7411(b)(1)(B), the Administrator deprives Plaintiffs and their members of information, published findings, and determinations, as described above. *See, e.g.*, *id.* § 7607(d)(3)-(6).  In addition, the Administrator's failures to take the actions required by § 7412(d)(6), § 7412(f)(2), and § 7411(b)(1)(B) deprive Plaintiffs and their members of the opportunity to receive judicial review of the lawfulness of the final EPA actions.  *See id.* § 7607(b).  These failures make it more difficult for Plaintiffs and their members to seek health and environmental protections from air pollutants; to shield themselves, their families, and other community members from exposure to such pollutants; to protect their health, recreational, aesthetic, and other interests; and to be able to enjoy activities in their daily life without concerns about exposure to air pollutants. These failures also impair Plaintiffs' ability to provide educational services to their members concerning air pollution from the SOCMI industry and hinder Plaintiffs' ability to provide services and take actions vital to fulfilling their public health missions.

118.    For all of the foregoing reasons, the failures complained of herein cause Plaintiffs and their members and constituents injuries for which they have no adequate remedy at law. Granting the requested relief would redress these injuries.

## CLAIMS FOR RELIEF

119.    The allegations of all foregoing paragraphs are hereby incorporated as if set forth fully herein.

**Violations of § 7412(d)(6) of the Clean Air Act**

120.    Each of the Administrator's ongoing failures to review and to either revise or issue a determination not to revise the HON Rule regulating the SOCMI source categories (as listed in Table A, above), in accordance with 42 U.S.C. § 7412(d)(6), constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of § 7604(a)(2) of the Clean Air Act for each such source category.

121.    Each day the Administrator fails to take these legally required actions, Defendant commits new, additional, and ongoing violations of its duties under § 7412(d)(6).

**Violations of § 7412(f)(2) of the Clean Air Act**

122.    Each of the Administrator's ongoing failures either to promulgate § 7412(f)(2) residual health and environmental risk standards or to issue a final determination not to promulgate such standards for the SOCMI source categories (as listed in Table A, above) constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of § 7604(a)(2) of the Clean Air Act for each such source category.

123.    Each day the Administrator fails to take these legally required actions, Defendant commits new, additional, and ongoing violations of its duties under § 7412(f)(2).

**Violations of § 7411(b) of the Clean Air Act**

124.    Each of the Administrator's ongoing failures either to promulgate revised § 7411(b) new source performance standards or to issue a final determination not to promulgate such standards for each of the NSPS SOCMI sources enumerated in Table B, above, constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not

discretionary" within the meaning of § 7604(a)(2) of the Clean Air Act for each such source category.

125.    Each day the Administrator fails to take these legally required actions, Defendant commits new, additional, and ongoing violations of its duties under § 7411(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request, for the SOCMI source categories regulated by the HON Rule, 40 C.F.R. Pt. 63, Subpts. F-I, summarized in Table A, above, that the Court:

(1)    Declare that each of the Defendant Administrator's failures to review the emission standards and to either revise standards promulgated under § 7412 or issue a final determination that such revision is not necessary under § 7412(d)(6) for the SOCMI source categories within eight years, constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of § 7604(a)(2);

(2)    Order the Defendant Administrator to review the emission standards and to either revise the emission standards or issue a final determination that such revision is not necessary under § 7412(d)(6) for each of the SOCMI source categories, in accordance with an expeditious deadline specified by this Court;

(3)    Declare that each of the Defendant Administrator's failures to review health and environmental risk remaining from standards promulgated under § 7412(d) and to either promulgate residual risk standards or issue a final determination that such standards are not required under § 7412(f)(2) for the SOCMI source categories constitutes a "failure of the

Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of § 7604(a)(2);

(4)     Order the Defendant Administrator to review the remaining health and environmental risk and to either promulgate residual risk standards or to issue a final determination that such standards are not required under § 7412(f)(2) for each of the SOCMI source categories, in accordance with an expeditious deadline specified by this Court;

WHEREFORE, Plaintiffs respectfully request, for the SOCMI stationary source categories regulated by the NSPS, enumerated in Table B, above, that the Court:

(1)     Declare that each of the Defendant Administrator's failures to review and either revise the NSPS promulgated under § 7411(b) or issue a final determination that such revision is not necessary under § 7412(b) for each of the SOCMI stationary source categories within eight years, constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of § 7604(a)(2);

(2)     Order the Defendant Administrator to review the NSPS and to either revise the NSPS or issue a final determination that such revision is not necessary under § 7411(b) for each of the SOCMI stationary source categories in accordance with an expeditious deadline specified by this Court;

WHEREFORE, Plaintiffs respectfully request, for each of the above-listed obligations and rulemakings at issue in this case, that the Court retain jurisdiction to ensure compliance with this Court's decree, award Plaintiffs the costs of this action, including attorney's fees, and grant such other relief as the Court deems just and proper.

DATED:          December 18, 2020          Respectfully Submitted,


<u>/s/ *Adam Kron*</u>                              <u>/s/ *Kathleen Riley*</u>
Adam Kron (D.C. Bar No. 992135)          Kathleen Riley (D.C. Bar No. 1618580)
ENVIRONMENTAL INTEGRITY          Emma Cheuse (D.C. Bar No. 488201)
PROJECT                                   EARTHJUSTICE
1000 Vermont Avenue NW, Suite 1100     1001 G Street NW, Suite 1000
Washington, D.C.  20005                Washington, D.C. 20001
(202) 263-4451                           (202) 667-4500 ext. 5227 or 5220
akron@environmentalintegrity.org        kriley@earthjustice.org
                                         echeuse@earthustice.org


*Counsel for*                             *Counsel for Plaintiffs Texas Environmental*
*Plaintiff Environmental Integrity Project*   *Justice Advocacy Services, California*
                                         *Communities Against Toxics, Louisiana*
                                         *Environmental Action Network, Ohio Valley*
                                         *Environmental Coalition, RISE St. James, and*
                                         *Sierra Club*